Opinión disidente emitida por el
Juez Asociado Señor Estrella Martínez.
[e\l derecho a [la] pensión de retiro por años de servicio del empleado público tiene un respetable contenido ético y moral y constituye un seguro de dignidad para el hombre o la mujer que habiendo dedicado al servicio público sus años fecundos, no debe encontrarse en la etapa final de su vida en el desamparo, o convertido en carga de parientes o del Estado. (Énfasis suplido). Rosa Resto v. Rodríguez Solís, 111 DPR 89, 92 (1981).
Nuevamente comparecen ante este Tribunal cientos de servidores públicos clamando justicia. Acuden desde los empleados de la Oficina del Contralor que han dedicado sus vidas por más de dos décadas a la lucha contra la corrupción; hasta los policías de mayor veteranía que se encuentran al borde de la edad obligatoria de retiro y se enfrentan a un estatuto que elimina la pensión por mérito, *899 reduce drásticamente el importe de la pensión y hasta duplica los años de servicio previo a retirarse.
Hoy todos los trabajadores peticionarios se enfrentan a una ley que menoscaba sustancialmente las obligaciones contraídas por el Estado. Además, se enfrentan a la realidad que revela el antiguo proverbio de que la cuerda triple no se corta fácilmente. En efecto, el hilo del Ejecutivo, el hilo del Legislativo y el hilo de una mayoría de este Tribunal se han entrelazado para crear una soga que, lejos de cortarse, ha estrangulado los derechos de los empleados públicos del Gobierno de Puerto Rico. Ciertamente, la soga no cortó por los más finos, cortó por los más humildes: los asalariados, los trabajadores, los que subsisten de quincena en quincena. Con ello, queda acreditado que las acciones de los componentes de esa cuerda triple han convertido en chatarra las obligaciones contractuales del Estado con los trabajadores y han degradado las garantías constitucionales del Pueblo.
En consecuencia, disiento por entender que la Ley Núm. 3-2013 está plagada de cambios drásticos al Sistema de Retiro que contravienen la Constitución de Puerto Rico. Veamos.
I
A. La See. 7 del Art. II de la Constitución de Puerto Rico garantiza que en nuestro sistema democrático de gobierno “no se apr[ueben] leyes que menoscaben las obligaciones contractuales”. LPRA, Tomo 1, ed. 2008, pág. 296. En iguales términos, la Sec. 10 del Art. I de la Constitución federal establece una prohibición homologa en su naturaleza, la cual veda que los estados de la Unión Americana promulguen estatutos que perjudiquen las relaciones *900 contractuales(1) Art. I, Sec. 10, Const. EE. UU., LPRA, Tomo 1.
En términos generales, esta prohibición constitucional impide que los estados y sus gobiernos locales emitan legislación alguna que pretenda atenuar los compromisos de una parte contratante o dificultar irrazonablemente la ejecución de un contrato. 2 Rotunda Nowak, Treatise on Constitutional Law: Substance and Procedure 5th Sec. 15.8(b), pág. 879 (2012). A su vez, la referida cláusula persigue incentivar el crédito y el comercio, promoviendo la confianza en la estabilidad de las relaciones contractuales. U.S. Trust Co. of New York v. New Jersey, 431 US 1, 15 (1977).
En consecución con estos fines, los pronunciamientos jurisprudenciales de esta Curia y del Tribunal Supremo federal han reconocido que esta garantía constitucional impide que el Gobierno incida adversamente sobre dos tipos de obligaciones contractuales: (1) las sostenidas entre partes privadas, y (2) en las que el Gobierno constituya una de las partes contratantes. U.S. Trust Co. of New York v. New Jersey, supra, pág. 17; Domínguez Castro et al. v. E.L.A. I, 178 DPR 1, 80 (2010). Según lo estableceremos más adelante, esta distinción resulta trascendental al momento de seleccionar el escrutinio constitucional que un Tribunal habrá de emplear ante un reclamo incoado al amparo de la cláusula contra el menoscabo de relaciones contractuales. Domínguez Castro et al. v. E.L.A. I, supra, pág. 80. Conscientes de la importancia que conlleva la identificación de una relación contractual como privada o pública en su naturaleza, pasemos a elaborar el marco de análisis aplicable ante una interpelación constitucional erguida sobre la palestra de la protección constitucional bajo examen.
*901 Como cuestión de umbral, cuando una parte reclame que el Gobierno, mediante la promulgación de legislación a esos efectos, ha menoscabado una relación contractual, un tribunal deberá determinar si la legislación impugnada realmente tuvo el efecto de perjudicar sustancialmente la alegada obligación contractual.(2) General Motors Corp. v. Romein, 503 US 181, 186 (1992); Energy Reserves Group, Inc. v. Kansas Power and Light Co., 459 US 400, 411 (1983); U.S. Trust Co. of New York v. New Jersey, supra, pág. 17. Ello, independientemente de si la relación contractual en disputa resulta ser pública o privada en su naturaleza.
El Más Alto Foro federal ha dividido este primer paso en tres factores adicionales, a saber: (1) si existe una relación contractual; (2) si un cambio legislativo ha menoscabado esa relación contractual, y (3) si el menoscabo infligido es sustantivo en su naturaleza. General Motors Corp. v. Romein, supra, pág. 186. Véanse, también: Keystone Bituminous Coal Ass’n v. DeBenedictis, 480 US 470, 504 (1987); Domínguez Castro et al. v. E.L.A. I, supra, págs. 81-82.
Al emplear el análisis señalado, urge tener presente que la prohibición instaurada en la cláusula constitucional en contra del menoscabo de relaciones contractuales no es absoluta en su naturaleza. Home Bldg. & Loan Ass’n v. Blais *902 dell, 290 US 398, 428 (1934) (“[T]he prohibition is not [...] to be read with literal exactness like a mathematical formula”). Véanse, también: Keystone Bituminous Coal Ass’n v. DeBenedictis, supra, pág. 502; Allied Structural Steel Co. v. Spannaus, supra, pág. 240; U.S. Trust Co. of New York v. New Jersey, supra, pág. 21; City of El Paso v. Simmons, 379 US 497, 508 (1965); Warner Lambert Co. v. Tribunal Superior, 101 DPR 378, 394 (1973). A esos efectos, la jurisprudencia federal ha establecido que un Estado puede afectar o modificar el remedio provisto por la relación contractual con la cual interviene, siempre y cuando no menoscabe derechos sustanciales.(3) City of El Paso v. Simmons, supra, pág. 503; Home Bldg. & Loan Ass’n v. Blaisdell, supra, pág. 430.
Es por ello que el Tribunal Supremo federal ha interpretado que la cláusula en contra del menoscabo de obligaciones contractuales debe quedar atemperada de cara al entendimiento de que en todo contrato, el Estado siempre se reserva un residuo de autoridad para poder legislar en consecución de la salud y seguridad pública, al igual que el bienestar general del pueblo. Energy Reserves Group, Inc. v. Kansas Power and Light Co., supra, pág. 410; Allied Structural Steel Co. v. Spannaus; supra, págs. 240-241 (“[T]he Contract Clause cannot obliterate the police powers of the State”); U.S. Trust Co. of New York v. New Jersey, supra, págs. 15-16; City of El Paso v. Simmons, supra, pág. 508 (“the reservation of essential attributes of the sovereign power [are] read into contracts as a postulate of the legal order”); Home Bldg. & Loan Ass’n v. Blaisdell, supra, *903 págs. 434-440; Warner Lambert Co. v. Tribunal Superior, supra, pág. 394. Respecto a la deferencia que un Tribunal viene llamado a otorgarle al ejercicio de ese residuo de poder por parte del Estado, amerita traer a memoria la bifurcación de contratos señalada, enfocando nuestra mirada, primeramente, sobre los contractos de naturaleza privada.
Cuando el contrato afectado es de carácter privado, los tribunales estamos llamados a otorgarle amplia discreción en tomo a lo que la Legislatura entiende que es o no resulta ser necesario para el bienestar general. City of El Paso v. Simmons, supra, pág. 508; U.S. Trust Co. of New York v. New Jersey, supra, pág. 16. No obstante, esa deferencia no es irrestricta o carente de fronteras. City of El Paso v. Simmons, supra, pág. 509; Warner Lambert Co. v. Tribunal Superior, supra, pág. 394. Ante el choque de los intereses del Estado en el ejercicio de su poder inherente como soberano y los intereses de las partes contratantes en que sus acuerdos no sufran un peijuicio sustancial legislativamente infundido, es función del Tribunal servir como ente reconciliador. U.S. Trust Co. of New York v. New Jersey, supra, pág. 21.
El Tribunal Supremo federal afirmó lo anterior en los siguientes términos:
Whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other. This principle precludes a construction which would permit the state to adopt as its policy the repudiation of debts or the destruction of contracts or the. denial of the means to enforce them. (Énfasis suplido). City of El Paso v. Simmons, supra, pág. 509.
Lo anterior se debe a que, de lo contrario, la cláusula en contra del menoscabo de relaciones contractuales sería letra muerta y quedaría desprovista de significado constitucional alguno. Allied Structural Steel Co. v. Spannaus, su *904 pra, pág. 241 (“[T]he Contract Clause remains part of the Constitution. It is not a dead letter”); U.S. Trust Co. of New York v. New Jersey, supra, pág. 16 (“Whether or not the protection of contract rights comports with current views of wise public policy, the Contract Clause remains a part of our written Constitution”).
En función de ello, el Tribunal debe tener presente que la garantía constitucional señalada limita ejercicios legítimos de legislación estatal y que la existencia de un interés público importante no siempre será suficiente para contravenir tal limitación. Keystone Bituminous Coal Ass’n v. De-Benedictis, supra, pág. 505; Allied Structural Steel Co. v. Spannaus, supra, pág. 242 (“If the Contract Clause is to retain any meaning at all, [...] it must be understood to impose some limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power”); U.S. Trust Co. of New York v. New Jersey, supra, pág. 21 (“private contracts are not subject to unlimited modification under the police power”).
A la luz de lo reseñado, una legislación que pretenda afectar relaciones contractuales existentes, privadas en su naturaleza, debe responder a un interés público legítimo y significante.(4) Energy Reserves Group, Inc. v. Kansas Power and Light Co., supra, págs. 411-412; U.S. Trust Co. of New York v. New Jersey, supra, pág. 22; Domínguez Castro v. E.L.A. I, supra, pág. 84. Además, la legislación lesiva a los derechos y las responsabilidades de las partes contratantes debe ser razonable y necesaria. Allied Structural Steel Co. v. Spannaus, supra, págs. 244 y 247; U.S. Trust Co. of New York v. New Jersey, supra, pág. 22; Domínguez Castro v. E.L.A. I, supra, pág. 84. Como norma general, los tribunales le otorgarán deferencia al Estado respecto a la *905 razonabilidad y necesidad de la legislación impugnada. Domínguez Castro v. E.L.A. I, supra, págs. 22-23.
Ahora bien, esta deferencia se limita estrictamente al análisis de contratos de carácter privado. Ello, pues, cuando la relación contractual menoscabada es pública en su naturaleza y el Estado constituye una de las partes contratantes, existen consideraciones adicionales que exigen un criterio de adjudicación constitucional mucho más oneroso para el Gobierno. U.S. Trust Co. of New York v. New Jersey, supra, pág. 23; Domínguez Castro v. E.L.A. I, supra, pág. 81. En primer lugar, será imperativo examinar si los derechos contractuales reconocidos por el Estado no representan un ejercicio ilegítimo de sus atributos esenciales como soberano. Específicamente, habrá que examinar si la legislatura contratante cedió poderes que vinculan indebidamente a las legislaturas futuras y sucesivas. U.S. Trust Co. of New York v. New Jersey, supra, pág. 23.
A esos fines, ya se ha determinado que el Estado tiene el poder de incurrir en compromisos financieros futuros con partes privadas. U.S. Trust Co. of New York v. New Jersey, supra, pág. 24. Una vez se crean estos compromisos financieros, el Estado viene obligado a satisfacerlos. Id. Aunque ciertamente el Gobierno puede modificar la obligación contractual incurrida mediante la promulgación de legislación, tal menoscabo sobrevivirá un examen constitucional solo si es necesario y razonable. Id., págs. 25—26.
En ese análisis, el Tribunal debe tener presente que el Estado velará por sus propios intereses. Por ello, y distinto al análisis empleado para relaciones contractuales de carácter privado, el Tribunal no puede conferirle deferencia al juicio de la legislatura respecto a qué representa una medida razonable y necesaria. Keystone Bituminous Coal Ass’n v. DeBenedictis, supra, pág. 505; Energy Reserves Group, Inc. v. Kansas Power and Light Co., supra, pág. 412 (“Unless the State itself is a contracting party, as is customary in reviewing economic and social regulations, courts *906 properly defer to legislative judgments as to the necessity and reasonableness of a particular measure”) (énfasis suplido); U.S. Trust Co. of New York v. New Jersey, supra, pág. 26 (“[C]omplete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State’s self-interest is at stake [...] If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all”). (Enfasis suplido).
Por lo tanto, en su análisis de lo que constituye una medida necesaria, el Tribunal debe emplear un examen consistente de dos criterios. Primero, una medida no es necesaria si imparte una eliminación total de la relación contractual menoscabada, cuando existía la posibilidad de instaurar una modificación menos drástica en su naturaleza. U.S. Trust Co. of New York v. New Jersey, supra, págs. 29-30. En segundo plano, una medida no es necesaria si existieron medios alternos para alcanzar el interés público articulado por el Estado.(5) Id., pág. 30; Domínguez Castro et al. v. E.L.A. I, supra, pág. 84.
En consecuencia, la selección de política pública realizada por el Poder Legislativo entre las muchas alternativas disponibles, no merece entera deferencia. Domínguez Castro v. E.L.A. I, supra, pág. 84. Como bien lo indicó el Tribunal Supremo federal, “a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purpose equally *907 well”. (Énfasis suplido). U.S. Trust Co. v. New Jersey, supra, págs. 30-31.
Respecto al criterio de razonabilidad, el Tribunal deberá valerse de un examen de previsibilidad a la luz de todas las circunstancias cambiantes. Véanse: Energy Reserves Group, Inc. v. Kansas Power and Light Co., supra, págs. 415-416; City of El Paso v. Simmons, supra, pág. 511. A esos efectos, una legislación que menoscabe relaciones contractuales será razonable solo si los efectos que se pretenden mitigar no fueron previstos o intencionados por el Estado al momento en el cual contrajo la obligación afectada. U.S. Trust Co. of New York v. New Jersey, supra, pág. 31. Un cambio no previsto será aquel que ocurra en el tipo del efecto, mas no en el grado de este. Id., pág. 32. (“subsequent changes [...] of degree and not of kind”).
Finalmente, amerita añadir que, como parte del análisis concerniente a la razonabilidad y necesidad de una medida, resulta imperativo examinar si son temporeras y dirigidas a atender una situación pública de emergencia, social o económica en su naturaleza. Domínguez Castro et al. v. E.L.A. I, supra, pág. 85. Si estos criterios adicionales no están presentes, urge inclinar la balanza en favor de la protección de la relación contractual menoscabada. Allied Structural Steel Co. v. Spannaus, supra, pág. 250.
Teniendo presente los principios generales aplicables a todo reclamo instado al amparo de la cláusula constitucional en contra del menoscabo de relaciones contractuales, pasemos a particularizarlos en el contexto de los planes públicos de retiro.
B. Por más de dos décadas, esta Curia ha reconocido que las participaciones de un empleado público en el sistema de retiro del gobierno constituyen “un interés propietario de naturaleza contractual protegido por la garantía constitucional contra el menoscabo de obligaciones contractuales”. (Énfasis suprimido). Bayrón Toro v. Serra, 119 DPR 605, 607-608 (1987). En concreto, hemos estable *908 cido, sin lugar a ambigüedades, que los planes de retiro son contratos públicos, mediante los cuales existe un “acuerdo de voluntades entre el Estado y el empleado, dirigido a producir un efecto vinculante para las partes”. (Énfasis suplido). Id., pág. 618.
Por un lado, la relación contractual acordada beneficia al Estado en su esfuerzo por reclutar y retener personal de alta calidad para el bien común del pueblo puertorriqueño. Bayrón Toro v. Serra, supra, pág. 615. Solo ofreciendo un atractivo plan de retiro, es que el Gobierno logra “atraer personal competente, que de otra forma ofrecería sus servicios a la empresa privada”. Id., pág. 616.
Por otra parte, el empleado público acepta la encomienda de servir a sus conciudadanos a cambio de este beneficio “de considerable importancia”, el cual “significa una fuente de ingreso futuro, que le permitirá disfrutar de su vejez con razonable seguridad económica”. (Énfasis suplido). Bayrón Toro v. Serra, supra, pág. 616. “Es indiscutible que cuando alguien acepta una oferta de empleo toma en consideración y descansa en la seguridad que le brinda el sistema de retiro”, convirtiéndose los términos y las condiciones de este beneficio en una “parte esencial de su contrato de empleo”. (Énfasis suplido). Id., págs. 616-617.
Reconociendo esta naturaleza contractual del plan de retiro gubernamental, hemos extirpado de nuestro ordenamiento legal la concepción anacrónica y retrógrada “de que las pensiones son [meras] concesiones o dádivas del Gobierno, y que un empleado participante [que aporta compulsoriamente a las mismas] no adquiere derecho alguno sobre” ellas. Bayrón Toro v. Serra, supra, pág. 610. A raíz de lo anterior, nuestra conceptualización de los planes de retiro en el plano legal, ha venido a descansar sobre el entendimiento certero de que “con el advenimiento de las democracias populares y la desaparición de los regímenes monárquicos, el fundamento jurídico de la pensión no lo *909 constituye un acto de recompensa del soberano, sino una obligación moral del Estado”. (Enfasis suplido). Id., pág. 615, citando a Rivera v. Rodríguez, 93 DPR 21, 24 (1966).
Tal obligación persigue reconocer el principio indeleble de que las pensiones constituyen “una retribución final y bien ganada por el empleado público que honrando una vocación de servicio, que en muchas ocasiones conlleva sacrificio y renuncia de bienes materiales, dedica los años fructíferos de su vida al bien común”. (Enfasis suplido). Bayrón v. Serra, supra, pág. 615, citando a Sánchez Nieves v. A.S.R.E.G.J., 116 DPR 372 (1985); Román Mayol v. Tribunal Superior, 101 DPR 807, 811 (1973); Maldonado v. Tribunal Superior, 100 DPR 370 (1972). Cónsono con lo anterior, hemos pautado que “[e]l derecho a [la] pensión de retiro por años de servicio [...] tiene un respetable contenido ético y moral y constituye un seguro de dignidad para el hombre o la mujer que habiendo dedicado al servicio público sus años más fecundos, no debe encontrarse en la etapa final de su vida en el desamparo o convertido en carga de parientes o del Estado”. (Enfasis suplido). Bayrón Toro v. Serra, supra, pág. 616.
Ante la importancia trascendental de este beneficio contractual de carácter público, en Bayrón Toro v. Serra, supra, pág. 618, fuimos prontos en concluir, categóricamente, que “los participantes [del] Sistema de Retiro del Gobierno tienen un derecho adquirido de naturaleza contractual que surge con el ingreso del empleado al sistema, independientemente de que la participación sea voluntaria o compulsoria”. (Enfasis suplido). A su vez, explícitamente reconocimos dos dimensiones de este derecho adquirido: (1) la dimensión del pensionado ya retirado, y (2) la dimensión del participante de la pensión, quien aún está pendiente por retirarse.
A la primera de estas dimensiones le conferimos una protección absoluta a la luz de la cláusula en contra del menoscabo de obligaciones contractuales. Es por ello que *910 establecimos que “[u]na vez el empleado se ha retirado [...], su pensión no está sujeta a cambios o menoscabos”. (Enfasis suplido). Bayrón Toro v. Serra, supra, pág. 618. Véanse, también: Rodríguez v. Retiro, 159 DPR 467, 474 y 477 (2003); Calderón v. Adm. Sistemas de Retiro, 129 DPR 1020, 1032 (1992) (“La Asamblea Legislativa no tiene facultad para menoscabar ese derecho adquirido de naturaleza contractual”). Respecto a la segunda dimensión del derecho adquirido bajo examen, aseveramos lo siguiente: “antes de que [un participante] pueda acogerse a la jubilación, los términos del sistema de retiro pueden ser enmendados por el Gobierno siempre que las enmiendas sean razonables y con el fin de adelantar” un fin importante del Estado. (Enfasis suplido). Bayrón Toro v. Serra, supra, pág. 618.
De tal manera, nuestras expresiones reconocieron que los términos del sistema de retiro pueden ser enmendados cuando el participante aún no se haya retirado. A esos efectos, también dispusimos que el aumento de la edad mínima para que un participante cualifique para el retiro; la reducción del importe de la pensión que recibirá el participante una vez se retire, y el aumento de la cantidad que un participante deberá aportar al fondo del retiro, constituyen, como mínimo, un menoscabo lo suficientemente severo como para que la cláusula constitucional en contra del perjuicio de obligaciones contractuales quede activada. Bayrón Toro v. Serra, supra, págs. 608-609 y 621-622.
A la luz de lo anterior, y adoptando los pronunciamientos del Tribunal Supremo federal en el ámbito de la garantía constitucional indicada, fuimos precisos en indicar que cuando una garantía contractual como esta quedaba menoscabada severamente por causa de las modificaciones señaladas, tal peijuicio solo quedaría justificado si el Estado sustentaba que la legislación promulgada a esos fines adelanta un fin público importante y que la modificación al *911 plan de retiro resulta ser razonable y necesaria. Bayrón Toro v. Serra, supra, pág. 621. Sostuvimos el requerimiento de que la modificación sea necesaria, además de razonable, en el entendimiento de que, cuando se trata de un contrato público en el cual el Gobierno es parte, el escrutinio judicial que se ha de emplear “debe ser más cuidadoso para asegurar que la actuación del Estado no sólo sea en beneficio propio”. Id., pág. 620.
No obstante, a pesar de reconocer la exigencia de que el menoscabo de relaciones contractuales públicas requiere un escrutinio judicial más oneroso para el Estado, en el cual se evalúe si las modificaciones impuestas a los participantes no retirados del fondo de retiro público son necesarias y razonables, guardamos total silencio respecto al significado de aquello que constituye una modificación necesaria y razonable, según el Más Alto Foro federal ya había definido tales conceptos.
Así, nuestro caso normativo en esta materia omite distinguir lo que ya hemos explicado, a saber: (1) que una modificación a un plan de retiro será necesaria solo si no existen medidas alternas para alcanzar el fin público proferido por el Estado, y (2) que tal medida será razonable, solo si los efectos que se pretenden mitigar no fueron previstos o intencionados por el Estado al momento en el cual contrajo con sus empleados públicos los beneficios de retiro afectados.
Ante tal omisión, urge que hoy interpretemos nuestros pronunciamientos en Bayrón Toro v. Serra, supra, a la luz de estas consideraciones adicionales, las cuales ya estaban plasmadas en la normativa del Tribunal Supremo de EE. UU. al momento de emitirse esa opinión, y que constituyen la protección mínima garantizada por la Constitución federal. Además, en esa faena hermenéutica, está vedado olvidar que “las leyes que crean derechos al disfrute de pensiones se deben interpretar liberalmente a favor del *912 beneficiario [,] a fin de que se cumpla el propósito reparador para las cuales fueron aprobadas”. Calderón v. Adm. Sistemas de Retiro, supra, pág. 1034.
Habiendo expuesto el marco jurídico aplicable a la controversia que nos atañe, pasemos a repasar las incidencias históricas, económicas y legislativas que han conducido al estado actual del plan de retiro de los empleados públicos del Gobierno de Puerto Rico.
II
A. El Sistema de Retiro de los Empleados del Gobierno de Puerto Rico se creó con el propósito de proveer seguridad económica a sus empleados a través del pago de una pensión vitalicia. Al 30 de junio de 2011, el Sistema de Retiro tenía un total de 135,972 participantes activos. Estos se distribuyen en 30,057, 50,346 y 55,569 empleados participantes de la Ley Núm. 447 de 15 de mayo de 1951 (3 LPRA see. 761 et seq.) (Ley Núm. 447), la Ley Núm. 1 de 16 de febrero de 1990 (3 LPRA sec. 766b et seq.) (Ley Núm. 1), y la Ley Núm. 305-1999 (3 LPRA see. 761 et seq.) (Reforma 2000), respectivamente. Además, existen 79,177 y 4,239 retirados para la Ley Núm. 447 y la Ley Núm. 1, respectivamente. Véase Valorización Actuarial del Sistema de Retiro al 30 de junio de 2011, Milliman, Wayne, PA.
Mediante el referido sistema, se pretende asegurar el ingreso de los pensionados para que se ajuste a las necesidades y al nivel de vida de cada uno de ellos, a la vez que se promueve la retención de recursos idóneos en el sector público. Con estos propósitos, se creó un fideicomiso conocido como el Sistema de Retiro mediante la Ley Núm. 447, en el que se estableció como edad promedio de retiro los 55 años de edad con veinticinco años de servicio. De esta forma, se sustituyeron los fondos de pensiones existentes mediante la Ley Núm. 70 de 3 de mayo de 1931 (3 LPRA see. 762 n.) (Cuerpo de la Policía Insular), la Ley Núm. 23 *913 de 16 de julio de 1935 (3 LPRA see. 762 n.) (funcionarios permanentes del Gobierno de Puerto Rico) y la Ley Núm. 155 de 9 de mayo de 1938 (3 LPRA see. 762 n.) (pensiones a las viudas de los policías que perdían su vida en funciones de su deber). En consecuencia, desde la creación del fideicomiso, el sistema comenzó con un déficit actuarial que el Estado estaba obligado a amortizar en un periodo de treinta años. Este compromiso no se cumplió. Así, el Estado sabía de antemano el deber que tenía para asegurar los compromisos contraídos con sus servidores públicos.(6)
Un déficit actuarial se crea cuando se otorgan beneficios mayores a los activos que posee el sistema de retiro. Por ende, resulta elemental que un déficit actuarial incrementa por ciertas razones principales, a saber: (1) la falta de aportaciones recurrentes al sistema; (2) el aumento de obligaciones, producto de un mayor número de beneficiarios no contemplados en su implementación, y (3) el rendimiento inadecuado de las proyecciones. Ante el panorama de todas estas circunstancias, los actuarios y otros alertaron al Estado sobre la falta de solvencia económica del Sistema de Retiro creado.(7) A su vez, hicieron hincapié en la obligación que tiene el Estado para realizar asignaciones anuales para cumplir con los compromisos contraídos. El Estado no encaró oportunamente los problemas señalados.
Para la década de los ochenta, la divulgación de la información fluyó y creó consternación sobre el futuro del fondo de retiro. Ello abonó a la incertidumbre respecto a si *914 los empleados públicos contarían con un sistema de retiro que atendiera sus necesidades. Nuevamente, el Estado se mostró indiferente. Mediante sus actuaciones continuó presentando medidas legislativas para aumentar los beneficios, incrementar los beneficiados y procedió con dejadez en el análisis de las necesidades para atender el déficit actuarial anunciado. Como consecuencia, el déficit actuarial ascendió a los $2.8 billones.(8)
La falta de acción provocó el crecimiento acelerado del déficit actuarial. Para una idea de la magnitud de las repercusiones, exponemos que al 30 de junio de 2011, el déficit actuarial ascendía a $23.7 billones para un total de $4.8 billones adicionales al 2009. No cabe duda que esto representa un problema que requiere ser atendido con extrema prontitud. Sin embargo, conforme a la propia Administración de los Sistemas de Retiro, el déficit actuarial surge desde el origen de la creación del fideicomiso, pero este no impediría la operación del sistema siempre que se pueda alcanzar un equilibrio actuarial. De esta forma, la Administración de los Sistemas de Retiro manifiesta que para lograr el equilibrio actuarial es necesario que el flujo de fondos provenientes de las aportaciones más el rendimiento de los activos sea adecuado para cubrir las obligaciones contraídas por el sistema. Según esa condición, el déficit actuarial no constituye un problema inmediato, ya que este únicamente se activa en caso de que se liquide el Sistema de Retiro. Véase Informe Final de 29 de junio de 2012 de la Comisión de los Sistemas de Retiro del Servicio Público de la Cámara de Representantes de Puerto Rico sobre la R. de la C. 283, 7ma. Sesión Ordinaria, 16ta Asamblea Legislativa, págs. 2-4.
La Administración de los Sistemas de Retiro sugiere concentrarse en un problema principal del Sistema de Re-tiro constituido por la falta de flujo de efectivo. Esta falta de dinero en caja afecta directa y recurrentemente el pago *915 de las obligaciones contraídas por el Estado con sus empleados públicos y pensionados. Claro está, el enfoque ex-clusivo de atender la necesidad del flujo de efectivo, sin un plan en que se capitalicen los activos del sistema, resultaría en la crónica de una muerte anunciada.
El déficit de flujo de efectivo del Sistema de Retiro de los Empleados de Gobierno ascendió de 2008 a 2009 a $380 millones cuando de 2007 a 2008 era de $240 millones. De otra parte, el Banco Gubernamental de Fomento estima que el déficit del Sistema de Retiro tendrá un impacto en el Fondo General de aproximadamente $900 millones anuales por los próximos veinticinco años.(9) El flujo negativo de caja agotará los activos del Sistema de Retiro para el 2014.(10)
El déficit en el flujo de efectivo responde, en gran medida, a que las aportaciones individuales y patronales son insuficientes para mantener los beneficios concedidos y a las gracias adicionales otorgadas sin la debida identificación de fondos para sufragarlas. Básicamente, el Sistema de Retiro se nutre de estas aportaciones. Igualmente, era de esperarse un crecimiento significativo del déficit en caja, según incrementaran los beneficiarios mediante la Ley Núm. 447 y la Ley Núm. l.(11)
A pesar de la insuficiencia de efectivo para cumplir con las obligaciones contraídas, el Estado procedió a inyectar *916 sumas no recurrentes para tratar de aminorar el impacto. Entre estas medidas, el Estado procedió a la venta de acciones de la Puerto Rico Telephone Company, la venta de activos del Sistema de Retiro, la adquisición de préstamos millonarios y la emisión desmedida de bonos. En este último caso, lejos de actuar con prudencia, el Estado emitió bonos de $3,000 millones que ocasionaron pérdidas al Sistema de Retiro. Por medio de esta emisión se crearon unas expectativas de rendimiento de 11%, las cuales resultaron únicamente en un ínfimo rendimiento real de 4.4% para cumplir con la obligación generada para con los bonistas de 6.6%. En 2008, la emisión de bonos alcanzó los $937 millones, los cuales para 2009 se habían convertido en tan solo $837 millones. No tan solo el rendimiento de estas emisiones de bonos fue muy por debajo de lo esperado, sino que el Estado prestó como colateral al pago de la deuda las aportaciones patronales, previamente comprometidas para el pago a nuestros pensionados. El resultado obtenido agravó aún más el Sistema de Retiro. Véanse: Primer Informe Parcial de 30 de junio de 2011 de la Comisión de los Sistemas de Retiro del Servicio Público de la Cámara de Representantes de Puerto Rico sobre la R. de la C. 417, 5ta Sesión Ordinaria, 16ta Asamblea Legislativa; Segundo Informe Parcial de 7 de octubre de 2011 de la Comisión de los Sistemas de Retiro del Servicio Público de la Cámara de Representantes de Puerto Rico sobre la R. de la C. 417, 6ta Sesión Ordinaria, 16ta Asamblea Legislativa; Tercer Informe de 30 de junio de 2012 de la Comisión de los Sistemas de Retiro del Servicio Público de la Cámara de Representantes de Puerto Rico sobre la R. de la C. 417, 7ma Sesión Ordinaria, 16ta Asamblea Legislativa.
La vorágine se acrecienta con las acciones y omisiones exclusivas del Estado, las cuales contribuyen a un mayor déficit que afecta a los miles de empleados públicos obligados a depender de este sistema para poder vivir digna *917 mente luego de una jomada de arduo trabajo. Para señalar solo algunas de las irrazonables actuaciones realizadas por el Estado, identificamos las siguientes: (1) el pago no subsidiado de leyes especiales;(12) (2) la extensión de beneficios a los cónyuges e hijos de los participantes;(13) (3) el aumento de aportaciones a los gastos fúnebres;(14) (4) la cantidad de préstamos concedidos a los miembros del sistema, que en el 2011 era de $1,275 millones, equivalente a un 37% del portfolio de inversiones;(15) (5) la falta y dejadez en el cobro de aportaciones patronales a los patronos morosos y a los municipios;(16) (6) la falta de cobro de deudas por el pago de leyes especiales y otros beneficios legislados que deben sufragar los municipios y las corporaciones públicas; *918 (7) la falta de cobro de intereses;(17) (8) la falta de aumento en el pago de las aportaciones patronales e individuales; (9) el aumento de pensionados (incluye las ventanas de re-tiro);(18) (10) el incremento porcentual en las pensiones sin *919 identificar la procedencia de fondos para su pago;(19) (11) el aumento de los salarios de los empleados antes del retiro; (12) el pago de pensiones sin revisar si estas proceden porque los beneficiarios hayan fallecido;(20) (13) la alta incidencia de participantes que se acogieron al sistema por incapacidad; (14) el cambio de expectativa de vida de los participantes del sistema sin que se tomaran previsiones a tales efectos; (15) las pensiones por mérito,(21) y (16) las inversiones mal estructuradas en la emisión de bonos, entre otras.(22)
*920 Todas estas razones eran conocidas por el Estado. Tan es así, que sirvieron de base para la Exposición de Motivos de la Ley Núm. 3-2013. Expresamente, el Estado señala que el Sistema de Retiro se afectó por las aportaciones inadecuadas que no estaban pareadas con los beneficios que se recibirían y la falta de proyección de los cambios económicos o actuariales que afectan a estos. Asimismo, el propio Estado destaca que una serie de leyes aprobadas entre 1960 y el presente debilitaron las finanzas, al aumentar los beneficios sin contar con aportaciones adicionales y sin que el propio Gobierno hiciera la aportación recomendada por los actuarios para cubrir los beneficios del retiro. De igual forma, el Estado reconoce el impacto de las leyes especiales —bonos de verano, para medicamentos, aguinaldo de Navidad, aportaciones a planes médicos, pensiones mínimas, beneficios por muerte o incapacidad y ajustes por el costo de vida— que fueron concedidos sin que los responsables por tal pago —el mismo gobierno, las corporaciones públicas y los municipios— remitieran el pago correspondiente.
El propio Estado admite que los programas de retiro temprano para reducir la plantilla laboral tuvieron el efecto de reducir los ingresos al Sistema de Retiro. Todo ello, unido a los cambios en la expectativa de vida de los participantes y los programas de préstamos personales, hipotecarios y de viajes culturales conferidos a los beneficiados, tuvieron un efecto de quebranto en la salud del Sis *921 tema de Retiro. En cuanto a la emisión de bonos, el Estado reconoce que no fue realizada conforme al patrón seguido por otras jurisdicciones, que asignaron una fuente de pago externa para pagar el servicio de la deuda. Por el contrario, y para agravar la situación del fideicomiso, en Puerto Rico la emisión se estructuró como una deuda del mismo Sistema, en donde las aportaciones patronales sirvieron como fuente de repago de los bonos. Como consecuencia de esta emisión, el Sistema de Retiro está obligado a pagar alrededor de $6,000 millones en intereses, más el principal de $3,000 millones con las aportaciones al fondo de retiro, que son la única fuente de ingreso para el pago de los beneficios a los pensionados. Véase la Exposición de Motivos de la Ley Núm. 3-2013, págs. 5-8.
Por otra parte, en un intento incompleto por atender la crisis, el Estado aprobó legislaciones dirigidas a aumentar la capacidad de inversión del Sistema de Retiro.(23) Además, para responder con el pago de pensiones futuras y mantener la solvencia del Sistema de Retiro, el Estado realizó cambios a la estructura del referido fideicomiso mediante la aprobación de la Ley Núm. 1 de 26 de febrero de 1990 y la Ley Núm. 305-1999 (Reforma 2000).
Mediante la Ley Núm. 1, se aumentaron las aportaciones patronales (9.275%) e individuales (8.275%) para los empleados que ingresaron posterior al 1 de abril de 1990. No obstante, y advertido de ello, el Estado declinó aumentar las aportaciones a los servidores públicos cobijados por la Ley Núm. 447. De igual forma, se estableció que: (1) la retribución promedio sería a base de los últimos cinco años de servicios; (2) la edad normal de retiro aumentó a los 65 años de edad; (3) las aportaciones patronales e individuales se remitirían en un término determinado, y (4) se requirió la realización de estudios actuariales antes de adoptarse cualquier medida que liberalizara fondos.
*922 Luego, y ante la insuficiencia de las medidas, se aprobó la Reforma 2000 para cerrar el Sistema de . Retiro y crear un Plan de Ahorros para el Retiro que beneficiara a los empleados que ingresen al gobierno a partir del 1 de enero de 2000. Mediante la Reforma 2000, los empleados públicos no recibían beneficios definidos, sino el rendimiento de sus ahorros en el sistema a los sesenta años de edad. Además, la aportación patronal que se hiciera para los participantes de la Reforma 2000 se utilizaría para sanear el déficit actuarial del antiguo sistema. A su vez, se eliminó el beneficio por incapacidad, no se garantizaron los beneficios al final de la jornada y el empleado quedó obligado a pagar un 25% de sus ganancias al Sistema para la administración de sus fondos.
Posteriormente, en el 2001 se presentaron varios proyectos con el fin de atemperar el quebranto del Sistema de Retiro. A pesar de ello, el Estado desatendió muchas de las medidas y declinó otras. Con sus acciones, aventajó los ingresos al Fondo General sobre los ingresos necesitados por el Sistema de Retiro. A modo de ejemplo, el 17 de abril de 2001, se presentó el P. de la C. 966 en el que se propuso destinar bianualmente 1% del monto total de las rentas anuales del Estado Libre Asociado al Sistema de Retiro para que fuera invertido y su rédito distribuido en los beneficiarios del Sistema. Este proyecto no fue aprobado por el impacto en el fondo general.
Más tarde, en el 2005 se presentó el P. del S. 476 con el fin de autorizar una emisión de bonos para financiar $2,000 millones para el Sistema de Retiro. Además, proponía un aumento en las aportaciones patronales e individuales. A pesar de que el P. del S. 476 contó con un informe positivo de la Comisión de Hacienda de la Cámara de Representantes, nunca fue llevado a votación en el pleno de la Cámara. Durante el 2009 hubo un nuevo intento de aumentar las aportaciones patronales —en específico las del Sistema de Retiro para Maestros— que tam *923 poco fue evaluado. También quedó pendiente en el 2010 un plan de reorganización para integrar los sistemas de retiro y crear una Junta de Síndicos. Otro intento en el 2012 para ingresar fondos al sistema lo fue el P. de la C. 4059, en el que se propuso requerir que las contribuciones sobre ingresos pagadas, en tomo a las pensiones recibidas del Sistema de Retiro de Empleados del Gobierno de Puerto Rico, sean depositados en el fondo de retiro, a fin de allegarle fondos adicionales al sistema. La medida también quedó engavetada.
Más tarde en el 2012 se presentó el P. del S. 2509 a los fines de crear la “Pega Dominical” como un sorteo para reforzar las finanzas del Sistema de Retiro y crear un fondo especial para cubrir el déficit actuarial. El proyecto tampoco fue evaluado por la Comisión. Lo mismo ocurrió con el P. de la C. 3918, presentado en el 2012 a los fines de proveer un sistema de sorteo electrónico desde la computadora personal y asignar esos fondos al Sistema de Retiro. Sin embargo, el Estado acaba de duplicar determinados sorteos de juegos de azar, cuyos ingresos no están destinados al Sistema de Retiro.
Independiente a ello, el Estado promulgó la Ley Núm. 96-2011 (3 LPRA sec. 1914a) para inyectar $162 millones en bonos con la esperanza de recibir $1,200 millones en un periodo no mayor de 40 años. Por otro lado, la Ley Núm. 114-2011 aumentó la aportación patronal para el fondo del sistema de retiro de maestros. También, la Ley Núm. 116-2011 validó una nueva enmienda al Sistema de Retiro. La pieza legislativa original contemplaba las propuestas de cambio siguientes, las cuales no fueron adoptadas: (1) que se aumentaran a los alcaldes los requisitos para ser acreedores del sistema; (2) el aumento de aportaciones individuales y la revisión periódica de estas; (3) la limitación del gravamen para la adquisición del empréstito, y (4) un término para el recobro de las deudas acumuladas por aportaciones al Sistema de Retiro. Ninguna de estas propues *924 tas fue avalada. Solamente, se validaron en esa ley las modificaciones parciales siguientes: (1) el incluir como miembros de la matrícula a los empleados transitorios; (2) aumentar las aportaciones patronales; (3) acoger la aprobación mediante certificación de deuda por parte del Sistema de Retiro al Centro de Recaudaciones sobre Impuestos Municipales o el Departamento de Hacienda, y (4) la imposición de criterios rígidos para conceder activos en garantías. A su vez, mediante la Ley Núm. 156-2011 (3 LPRA sees. 766 y 766d) y la Ley Núm. 196-2011 (3 LPRA sees. 785, 785a y 779a), se modificó la cartera de préstamos del sistema y el ingreso de las cooperativas en este programa. A pesar de ello, las medidas aprobadas en el 2011 no tendrán un impacto significativo en las finanzas del sistema. Véase Sistema de Retiro de los Empleados del Gobierno, Origen, déficit actuarial y recomendaciones, Comisión Especial Permanente sobre los Sistemas de Retiro, enero 2013, Vol. 3.
Ante este cuadro, desoyendo el reclamo de varios sectores y carente de información actuarial para valorizar las modificaciones, el Estado aprueba a la ligera la Ley Núm. 3-2013.(24)
B. Ante ello, es nuestro deber identificar el abanico de propuestas y recomendaciones que el Estado tiene ante sí, previo a recurrir e imponer sobre los servidores públicos todos los cambios drásticos incorporados con la aprobación de la Ley Núm. 3-2013. Veamos las alternativas disponibles que son menos drásticas y razonables.
*925 En cuanto a las propuestas presentadas por los miembros de la Cámara de Representantes y del Senado, destacamos las que facilitan fondos recurrentes al Sistema de Retiro.(25) Revisemos.
Entre las opciones que tiene el Estado se encuentran un sinnúmero de proyectos presentados por la Cámara de Representantes con el fin de atender el problema del Sistema de Retiro. Realzamos los siguientes: (1) el R de la C. 786, que pretende crear la Ley de Justicia Tarifaria y Rescate del Sistema de Retiro de Puerto Rico, mediante la cual se propone la distribución al Sistema de Retiro del exceso de recaudos de $1,800 millones de la imposición fija del arbitrio especial a las entidades foráneas; (2) el P. de la C. 868, que propone la Ley de Juegos al Azar con el fin de transferir fondos de los ingresos brutos generados por las máquinas tragamonedas; (3) el P. de la C. 917, que promueve transferir de la Contribución Mínima Tentativa un porcentaje determinado al Sistema de Retiro; se estima que esta iniciativa podría redundar en $150 millones anuales; (4) el P. de la C. 922, que procura disponer que el 1% del arbitrio a la adquisición de cierta propiedad mueble y servicios se destine al Sistema de Retiro; (5) el P. de la C. 925, que propone un aumento en la aportación patronal al Sistema de Retiro y aumenta el tiempo de servicio y la edad de retiro para que los alcaldes puedan beneficiarse del programa; (6) el P. de la C. 926, que persigue eliminar la exención contributiva a los espíritus destilados u otras bebidas alcohólicas para asignar ese recaudo al Sistema de Retiro; se estima que la medida recaudaría $180,000,000; (7) el P. de la C. 981, que enmendaría la Ley de la Lotería de Puerto Rico y asignaría $10,000,000 al Sistema de Retiro; *926 (8) el P. de la C. 997, que establece una contribución especial a las cooperativas de ahorro y crédito, subsidiarias y afiliadas para el fondo del retiro de los maestros, y (9) el P. de la C. 1045, que provee para descontar las deudas de ciertas remesas al Sistema de Retiro, lo cual resultaría en una inyección inmediata de $60,542,036.
De otra parte, los proyectos presentados por el Senado como opciones para atender la referida crisis son los siguientes: (1) el P. del S. 23, que persigue crear la “Pega Dominical”, cuyos fondos serían destinados a reforzar las finanzas del sistema; (2) el P. del S. 219, que propone enmendar la Ley de Seguro de Responsabilidad Obligatorio para Vehículos de Motor, a los fines de disponer que $4 de la prima pagada por el seguro obligatorio fuera destinada al Sistema de Retiro; se estima que existen 3,045,000 vehículos de motor, por lo que la medida podría aportar fondos en $12,180,000 anuales; (3) el P. del S. 428, que enmendaría la Ley de Seguro de Responsabilidad Obligatorio para Vehículos de Motor con el fin de incluir 84 centavos mensuales a la prima universal inicial del seguro de responsabilidad obligatorio y destinarla al Sistema de Retiro; la cual redundaría en $2,557,000 anuales; (4) el P. del S. 429, que crearía la Ley del Fondo de Ayuda al Sistema de Retiro del Estado Libre Asociado de Puerto Rico, que establecería que toda corporación multinacional que venda más de un billón de dólares por año estará obligada a dejar en la banca local un 25% de ese dinero en Puerto Rico, por un término de diez años y de ese dinero se le traspasará un 5% al referido fondo con el propósito de reducir el déficit actuarial; (5) el P. del S. 430, que autorizaría al Sistema de Retiro a tomar dinero prestado de la Asociación Conjunta del Seguro de Responsabilidad Obligatorio; (6) el P. del S. 431, que crearía la Ley de Justicia al Pensionado del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico, mediante la cual se cedería un 2% del dinero retenido por toda entidad bancaria o financiera en nuestra jurisdicción, como parte del dinero en *927 circulación(26) de los depósitos de nómina de pensionados del Sistema de Retiro y de la nómina de empleados públicos; (7) el P. del S. 474, que destinaría al Sistema de Retiro el exceso de $6,500,000 de los fondos transferidos por la Asociación de Suscripción Conjunta, provenientes de la partida de Fondos Retenidos por el Asegurador Pertenecientes a Otros, luego de que estos se convierten en propiedad del Gobierno de Puerto Rico y pasen al Fondo General del Tesoro Estatal, y (8) el P. del S. 493, un proyecto similar al P. del S. 474, dirigido a crear una nueva asignación anual para nutrir el déficit actuarial del Sistema de Retiro.
Además, durante el proceso de la aprobación de la Ley Núm. 3-2013 participaron distintos sectores en representación de los grupos obreros y otros. Estos expusieron claramente las repercusiones que la medida conllevaría en los servidores públicos. En ese proceso no tan sólo presentaron sus opiniones, sino que emitieron recomendaciones al Estado. Muchas de las recomendaciones razonables y acciones necesarias que el Estado pudo implantar son las siguientes: (1) cobrar las deudas que mantiene el Sistema de Retiro y no condonarlas; (2) requerir que se cumpla con el envío de las aportaciones individuales y patronales retenidas y que se impongan multas y penalidades por tal incumplimiento; (3) aumentar la captación del Impuesto a la Venta y Uso; (4) atender la evasión contributiva; (5) evaluar aumentar razonablemente las aportaciones de los empleados; (6) reducir los contratos de servicios profesionales, consultivos y de publicidad; (7) solicitar informes sobre el impacto de aprobaciones de leyes que permitieron acogerse al retiro a ciertos empleados para evaluar si recibieron aumentos de sueldo con el propósito de gozar de mayores beneficios al momento de la jubilación; (8) establecer un “grandfather clause” para aplicarse a servidores públicos *928 de más de cincuenta años para que puedan retener su derecho a retirarse por mérito; (9) investigar el desembolso de beneficios a favor de personas fallecidas, y (10) solicitar información certificada sobre: (a) las deudas patronales, planes de pago y cumplimiento de éstos, y (b) las deudas condonadas a patronos y las razones para ello. Véanse: Ponencia de 14 de marzo de 2013 del Grupo de Funcionarios y Empleados de la Oficina del Contralor de Puerto Rico, págs. 8 y 9; Ponencia de 20 de marzo de 2013 de Servidores Públicos Unidos de Puerto Rico, Concilio 95/AFSCME con relación al P. de la C. 888, págs. 15-17.
Queda evidenciado que el Estado tuvo y tiene a su alcance varias recomendaciones y alternativas viables para reducir la brecha del flujo de efectivo del Sistema de Re-tiro, el cual amenaza con afectar la solvencia del fideicomiso. A pesar de ello, el Estado procedió a aprobar la Ley Núm. 3-2013. Expongamos las consecuencias adversas y los cambios drásticos contenidos en la legislación que nos ocupa.
III
Como hemos expuesto, el Sistema de Retiro está enmarcado en tres legislaciones diferentes, a saber: la Ley Núm. 447, la Ley Núm. 1 y la Reforma 2000. La Ley Núm. 3-2013 propone cambios radicales, entre los que se destacan los siguientes: (1) crear un programa híbrido de contribución definida; (2) eliminar la pensión por mérito (edad más años de servicio); (3) modificar las estructuras de las leyes que cobijan a los empleados públicos en el Sistema de Retiro; (4) alterar y requerir más años de servicio a los servidores públicos para gozar de los beneficios de una jubilación; (5) reducir beneficios especiales; (6) aumentar la aportación individual del empleado público, y (7) aumentar el desembolso del empleado público al obligarle a adquirir *929 un seguro por incapacidad e imponerle los gastos de la administración del sistema.
En términos generales, los beneficiarios de la Ley Núm. 447 y la Ley Núm. 1, hasta la aprobación de la Ley Núm. 3-2013, gozaban de un plan de beneficio definido y una pensión por mérito con ciertas condiciones. Por su parte, la Reforma 2000 no contemplaba un beneficio definido, ya que esta funcionaba como un plan de ahorro el cual repartía la aportación del empleado más el rendimiento que esta pudiera generar, por lo que no existía un beneficio mínimo estipulado.
Las anualidades de retiro de los participantes de la Ley Núm. 447 eran calculados a base del 1.5% del salario promedio multiplicado por los primeros veinte años de servicio, más un 2% del salario promedio multiplicado por los años de servicio restantes.(27) En todo caso, la anualidad no podía exceder de un 75% de su salario promedio. Además, al amparo de la Ley Núm. 447, los empleados tenían la opción de recibir una pensión por mérito equivalente al 75% de su salario promedio, siempre y cuando contaran con treinta años de servicio y 55 años de edad. No obstante, por virtud de la Ley Núm. 3-2013 la pensión por mérito ha quedado eliminada, excepto para todo empleado que entre el 1 de julio de 2013 y el 30 de diciembre de 2013, cumpla con las condiciones indicadas. Ahora bien, de estos empleados ejercer su derecho, su pensión quedará reducida hasta un 15%. Véase Informe de la Reforma del Sistema de Re-tiro, Ley Núm. 3-2013. http:// www.retiro.pr.gov/wpcontent/uploads/2013/04/Presentacion-Ley-3-17-de-abrilde-2013.pdf.
Por otra parte, al aprobarse la Ley Núm. 1 la anualidad de retiro de todo empleado que entrara al servicio público entre el 1 de abril de 1990 y el 31 de diciembre de 1999, *930 equivaldría al 1.5% por ciento de su salario promedio multiplicado por sus años de servicio.(28) Ambas legislaciones contemplaban un beneficio mínimo.
La Ley Núm. 3-2013 alteró el pilar de estos sistemas al cambiar la fórmula de beneficio a partir de 30 de junio de 2013; eliminó la pensión por mérito, y exigió a los servidores públicos laborar por más tiempo, requiriéndoles, a su vez, mayores aportaciones y eliminando beneficios.
Básicamente, a partir de 30 de junio de 2013, los integrantes de la Ley Núm. 447 y la Ley Núm. 1 tendrán que trabajar más tiempo y luego de esa fecha sus beneficios para jubilación equivaldrían a un plan de ahorro.(29) En cuanto a los empleados bajo la Reforma 2000, estos no podrán contar con el rembolso en una suma global de lo que aportaron para luego poder invertirlo, sino que, por el contrario, dependerán de una anualidad vitalicia. Ante la incertidumbre de cuánto realmente será el rendimiento de su dinero, los empleados públicos tendrán mayores dificultades para planificar su retiro. A su vez, nadie les garantiza que el nuevo sistema de retiro goce de suficiente liquidez para cumplir con el pago de estas anualidades una vez estos empleados se retiren.
Con relación a la edad de retiro, debemos señalar que, en términos generales, bajo la Ley Núm. 447 un empleado podía retirarse a los 55 años de edad con 25 años de servicio, o 58 años de edad con diez años de servicio. De igual forma, la Ley Núm. 447 proveía para que un empleado se pudiera acoger a una pensión diferida.(30) Por el contrario, *931 con las modificaciones introducidas por la Ley Núm. 3-2013, los participantes bajo la Ley Núm. 447 que tengan, al 30 de junio de 2013, 55 años de edad o menos, podrán retirarse a los 61 años de edad, por lo que tendrán que laborar y aportar, como mínimo, por tres años adicionales a los que se comprometieron al comenzar su faena de servicio. El examen de cada uno de los restantes grupos escalonados demuestra que los cambios efectuados, relacionados con la edad para acogerse a los beneficios, tienen el efecto de, como mínimo, duplicar los años que le faltaba a un empleado para retirarse bajo la Ley Núm. 447.(31)
Por su parte, la gran mayoría de los empleados cobijados por la estructura creada por la Ley Núm. 1 podrán retirarse a los 65 años de edad, pero no contarán con el beneficio de un retiro temprano y del ajuste actuarial que ello conllevaba. Recordemos que mediante la opción del re-tiro temprano existente, antes de entrar en vigor la Ley Núm. 3-2013, un empleado cobijado por la Ley Núm. 1, podía jubilarse una vez cumplía un mínimo de 25 años de servicio y alcanzaba la edad de 55 años. Ahora, estos empleados tendrán que esperar a la edad mínima de 65 años para recibir los beneficios. Un ejemplo basta para conceptualizar el alcance nefasto de esta situación. Un empleado público que a sus 21 años de edad comenzó a laborar para el servicio público el 1 de abril de 1990, hubiera podido optar por el retiro temprano de cumplir con 25 años de servicio y 55 años de edad. Por lo tanto, este empleado, al 30 de junio de 2013, le faltaban solo 2 años de servicios y tendría que haber esperado, únicamente, 11 años para cumplir con el requisito de edad y recibir su pensión por *932 retiro temprano. No obstante, con los cambios impuestos por la Ley Núm. 3-2013, ahora tendrá que trabajar por los próximos 21 años hasta alcanzar los 65 años de edad, lo que equivale a 10 años adicionales de servicio a los que contempló originalmente al firmar su contrato de empleo.
Los empleados cubiertos por lo que era la Reforma 2000 podían retirarse a los 60 años de edad. Sin embargo, con las nuevas enmiendas introducidas por la Ley Núm. 3-2013, si estos no tienen la edad de 60 años al 30 de junio de 2013, se les duplica el tiempo que les resta por aportar al sistema, al igual que los beneficiados de la Ley Núm. 447.(32) De ahora en adelante, mediante la Ley Núm. 3-2013, todo empleado que ingrese al Sistema de Retiro podrá recibir los beneficios de jubilación a los 67 años de edad, o a los 55 años de edad, si es considerado un empleado de alto riesgo.
Con relación a la situación particular de los empleados de alto riesgo (policías y bomberos), bajo la Ley Núm. 447, podían retirarse al cumplir 50 años de edad y completar 25 años de servicio. Asimismo, estos servidores podían retirarse antes de cumplir los 50 años de edad si habían prestado entre 10 a 25 años de servicio. No obstante, esta segunda alternativa implicaba una anualidad diferida hasta la fecha en la cual cumplieran los 50 años de edad. En ambos casos, la anualidad sería equivalente a los demás empleados cobijados por la Ley Núm. 447. De igual forma, el retiro de los policías y bomberos era obligatorio a partir de los 62 años.
En el caso de los servidores públicos de alto riesgo cobijados por la Ley Núm. 1, podían retirarse a la edad de 55 años, siempre y cuando hubieran completado 30 años de *933 servicio. En estos casos, distinto a otros empleados, se gozaba del derecho a un 75% de su retribución promedio. Si el empleado de alto riesgo se retiraba antes de los 55 años de edad con 30 años de servicio, se reducía su pensión a un 65% de su retribución promedio.
Con la Reforma 2000, para los empleados de alto riesgo el legislador mantuvo la edad de retiro en los 55 años. A su vez, eliminó la edad de retiro obligatoria para estos funcionarios. Respecto a la aportación individual de estos empleados, la ley mantuvo el 8.275% de su retribución mensual. Sin embargo, el empleado de alto riesgo que comenzara a laborar a partir del 1 de enero de 2000, vería limitado el importe de su pensión al total de ahorros generados por tales aportaciones a lo largo de su carrera, más el rendimiento alcanzado por la inversión de estas.
Con el advenimiento de la Ley Núm. 3-2013, se catalogó como empleados de alto riesgo a los policías, bomberos estatales y municipales, y a los oficiales de custodia, excluyendo de esta clasificación a los alguaciles. De igual forma, la Ley Núm. 3-2013 ubicó al personal de alto riesgo en un programa híbrido de contribución definida. Como consecuencia, aquellos empleados de alto riesgo cobijados por la Ley Núm. 447, tendrán que esperar hasta tener 55 años de edad y 30 años de servicio para retirarse, por lo que les aumentó en 5 años la edad de retiro y el tiempo de servicio. Igualmente, aquellos servidores de alto riesgo acogidos a la Ley Núm. 1 tendrán que esperar a los 55 años de edad y 30 años de servicio para jubilarse. Por lo tanto, de igual forma se incrementó por 5 años su tiempo de servicio. La situación de estos funcionarios se recrudece aún más al considerar que tienen que retirarse por obligación a los 58 años de edad y 30 años de servicio.
Por otra parte, mediante esta nueva pieza legislativa, se aumentan los desembolsos que los servidores públicos deben hacer. Así, su aportación se establece en un mínimo de 10% de su retribución. Como si ello no fuera poco, al elimi *934 narse la pensión por incapacidad ocupacional o no ocupacional, se obliga a estos servidores a desembolsar para la adquisición de un seguro por incapacidad. Ese costo, aunque no debe exceder de un cuarto por ciento de la retribución del participante, aún no ha sido establecido por el Administrador del Sistema de Retiro.(33)
Por otra parte, la Ley Núm. 3-2013 elimina varios beneficios para los futuros retirados y reduce otros para los futuros pensionados: el bono de Navidad, la aportación patronal al plan médico, y el bono de medicamentos. De otra parte, esta ley elimina los reconocimientos de servicios no cotizados, la facultad de devolver y transferir aportaciones, y modifica los beneficios por defunción.
Con el marco expuesto, pasemos a aplicar el derecho discutido a la controversia ante nuestra consideración.
IV
En las peticiones de certificación ante nuestra consideración, cientos de empleados públicos alegan que la Ley Núm. 3-2013 es inconstitucional por menoscabar sustancialmente los beneficios de retiro contractualmente acordados entre ellos y el Estado. Distinto al criterio errado de una mayoría de esta Curia, los peticionarios están asistidos por la justicia y la razón. Veamos.(34)
Según lo discutido en nuestra exposición del Derecho, en nuestra jurisdicción no existe duda alguna de que las participaciones de un empleado público en el sistema de *935 retiro del Gobierno de Puerto Rico constituyen un interés propietario de naturaleza contractual que activa la garantía constitucional en contra del menoscabo de relaciones contractuales. La Ley Núm. 3-2013, al aumentar considerablemente la edad de retiro y los años de servicio que un servidor público deberá satisfacer antes de acogerse al re-tiro; al reducir significativamente el importe de la anualidad que recibirán los empleados públicos una vez se jubilen; al eliminar la acumulación de beneficios conferidos por las Leyes Núm. 447 y Núm. 1, en aras de establecer un nuevo programa de contribución definida; al aumentar la aportación de los peticionarios al fondo de retiro; al eliminar o reducir los beneficios otorgados a los servidores públicos por virtud de ciertas leyes especiales, y al imponer el pago de un seguro de incapacidad, ha menoscabado sustancialmente las expectativas de retiro y el contrato de empleo de los servidores públicos, en el cual se les reconoció un derecho adquirido a sus participaciones en el fondo de pensión del Estado, según los términos y las condiciones dispuestas en la Ley Núm. 447, la Ley Núm. 1 y la Reforma 2000.
Un menoscabo contractual tan severo como este, solo puede sobrevivir las exigencias de nuestra Constitución si el Estado logra articular que la Ley Núm. 3-2013 es necesaria y razonable para alcanzar un fin público importante. Al considerar estos factores, no debe haber duda de que, por ser el sistema de retiro un contrato público en el cual el Estado es una de las partes contratantes, no hay cabida para otorgarle a la Asamblea Legislativa una deferencia ciega respecto a si las modificaciones instauradas por la Ley Núm. 3-2013 representaban la vía más necesaria y razonable para el fin público perseguido. Emplear el escrutinio constitucional bajo examen de tal manera, equivale a una renuncia tácita e ilegítima de nuestro poder constitucional para examinar la validez de las leyes a la luz del significado de nuestra Ley Suprema, según tal significado *936 ha sido demarcado por esta Curia y el Tribunal Supremo de los EE. UU. Aclarado lo anterior, examinemos estos factores de cara al contexto específico de la Ley Núm. 3-2013.
La Exposición de Motivos de la Ley Núm. 3-2013, nos ilustra que el fin público perseguido por el Estado, al aprobar la disposición legal indicada, lo constituía atender la erosión total de los activos del sistema de retiro público y evitar la degradación del crédito de Puerto Rico al llamado nivel “chatarra”. Véase Exposición de Motivos de la Ley Núm. 3-2013. Para que la Ley Núm. 3-2013 sea válida constitucionalmente, las modificaciones instauradas por su texto para alcanzar ese fin público, debían ser las alternativas necesarias y razonables.
Como bien indicamos, una medida legislativa que menoscaba relaciones contractuales será necesaria si no existían medidas legislativas alternas que lograran la obtención del fin público perseguido de manera menos drástica. En el caso particular ante nuestra consideración, encontramos que existían medidas alternas menos drásticas para inyectarle fondos al sistema de retiro público y evitar la erogación de sus activos.
Según expusimos detalladamente en la Parte II-B de esta opinión, al momento de aprobarse la Ley Núm. 3-2013, los miembros de la Cámara y el Senado, y las entidades y los sectores de nuestra sociedad que representaban a los empleados públicos afectados, presentaron una miríada de alternativas razonables y menos drásticas a la Ley Núm. 3-2013, las cuales prometían allegar una cantidad significativa de fondos recurrentes al sistema de retiro público.
Estas numerosas alternativas hubiesen resuelto el problema de flujo de caja del sistema de retiro, evitando así la necesidad de imponer sobre los hombros frágiles de los empleados públicos, la carga onerosa de los déficits creados negligentemente por el Estado. Ante la disponibilidad abrumadora de medidas alternas que hubiesen evitado el *937 menoscabo contractual aquí impugnado, resulta forzoso concluir que la Ley Núm. 3-2013 no era necesaria.
En iguales términos, la disposición bajo examen tampoco es razonable en su naturaleza. Según lo discutimos, una medida legislativa es razonable solo si los efectos que se pretenden mitigar con su promulgación no eran previsibles o intencionados por el Estado al momento en el cual contrajo la obligación menoscabada. Cuando analizamos la Ley Núm. 3-2013 a la luz de este crisol, encontramos que los efectos que pretende mitigar fueron previstos desde la fecha cuando se creó el sistema de retiro público. Peor aún, las acciones y omisiones del Estado por los pasados 62 años han sido esfuerzos que han agravado la crisis que hoy pretende remediar, a costas del bienestar de miles de empleados públicos inocentes.
Concretamente, desde el 15 de mayo de 1951, fecha en la cual se creó el sistema de retiro que hoy analizamos, el Estado conocía que el mismo sufría de un déficit actuarial millonario que debía atajar con prontitud. Desde 1957 hasta el presente, la Oficina del Contralor y otras entidades financieras públicas y privadas, pronosticaron el crecimiento desbocado de este déficit y aconsejaron al Estado respecto a la necesidad de atender la crisis financiera del retiro oportuna y adecuadamente.
A su vez, el Gobierno conocía que, por virtud del número significativo de participantes del sistema de retiro pronto a retirarse, el déficit actuarial quedaría agravado por un déficit en el flujo de efectivo, el cual incidiría sobre la liquidez del sistema y la fuente de pago de los beneficios de los empleados. A pesar de estas exhortaciones e indicios de peligro, el Estado se cruzó de brazos y permitió que los déficits trogloditas crecieran desmedidamente.
Peor aún, el Estado se convirtió en agente activo de la crisis que veía venir, tomando acciones en detrimento de la liquidez del fondo de retiro. Según lo expuesto, el Estado: (1) aprobó un número significativo de leyes especiales que *938 concedieron unos beneficios adicionales a la anualidad de retiro; (2) mantuvo en un nivel insostenible el porcentaje mínimo de las aportaciones patronales y de los empleados; (3) emitió bonos garantizados por las aportaciones patronales requeridas para el pago de beneficios de retiro, y (4) otorgó un sinnúmero de préstamos que comprometieron la liquidez del sistema. Por causa de estas acciones, desde 1954 al presente, los déficits indicados continuaron su ascenso a niveles insostenibles.
Mientras tanto, el Estado se hizo el desentendido y se convirtió en el principal responsable de lo que hoy, en aras de evadir responsabilidad, pretende catalogar como una “acción inevitable”. Nada más lejos de la verdad. Todo lo reseñado apunta a que esta crisis era previsible desde el momento cuando se creó el sistema de retiro que hoy se encuentra al borde del abismo. Asimismo, las acciones y omisiones del Estado han sellado el fracaso del sistema, en aras de atender otros intereses de menor importe social. Ante tal proceder, la Ley Núm. 3-2013 no cumple con el criterio de razonabilidad.
En resumidas cuentas, las cargas impuestas a los trabajadores puertorriqueños por virtud de la Ley Núm. 3-2013 no eran necesarias ni razonables. Consecuentemente, no quedaba otra alternativa que reconocer los vicios de inconstitucionalidad presentes en la ley impugnada,(35)
Sin embargo, la decisión de una mayoría de este Tribunal opta por vindicar la Ley Núm. 3-2013, la cual solo puede interpretarse como la opción más drástica disponible en el arsenal legislativo del Estado, que conlleva la nefasta realidad de: (1) acelerar la decisión de jubilación o renuncia de los servidores públicos, ocasionando la erogación de fondos no previstos; (2) aumentar de manera dramática e irrazonable los años de servicio requeridos a un *939 empleado para jubilarse; (3) reducir los beneficios de jubilación acordados cuando fue nombrado; (4) agravar la crisis económica y social que atraviesa Puerto Rico, al impedir que los empleados públicos puedan cumplir cabalmente con sus deudas contraídas, ya que al momento de jubilarse no contarán con los ingresos esperados y planificados para su jubilación; (5) limitar las opciones de los servidores públicos, quienes no gozan de alternativas con relación al disfrute de las aportaciones que realizaron; (6) promover la inestabilidad emocional, afectando así la salud y el bienestar de los servidores públicos, quienes desconocen el monto con el que podrán contar al momento de retirarse, y (7) impedir que el empleado público pueda ahorrar debido a que se gravan sus fondos al aumentar sus aportaciones y requerírsele que adquieran un seguro de incapacidad y que aporten al pago de la administración del sistema.(36)
Hoy, una mayoría de esta Curia obvia esta realidad. Como situación agravante, compran “el argumento ad terrorem de que la legislación [bajo examen] es intocable judicialmente debido a que la anulación causaría una posible degradación del crédito del país”.(37) De tal manera, permiten que el Estado cancele “unilateralmente su compromiso laboral con los servidores públicos [...], pretendiendo amordazar al Poder Judicial” en el proceso.(38) En efecto, dos hilos se han entrelazado armoniosamente con un hilo de la mayoría de este Tribunal y el resultado irremediable es que la cuerda triple amordazó a la justicia.
Al así obrar, la opinión mayoritaria le da la espalda al trabajador puertorriqueño, permitiendo que el Estado le imponga la carga de sus errores a los servidores públicos que confiaron en él. De este modo, olvidan las palabras acertadas del Juez Asociado Señor Alonso Alonso, quien, en *940 una coyuntura similar a la que hoy examinamos, afirmó lo siguiente:
El Estado y las entidades que tienen responsabilidad sobre la administración y buena marcha de los sistemas de retiro tienen sobre sus hombros una gran responsabilidad de mantener la solvencia de los sistemas de retiro y de administrarlos con debido cuidado y prudencia.
El Estado no debe justificar cambios al sistema de retiro al alegar que son necesarios y razonables para mantener la solvencia económica de éste cuando la debilidad fiscal del mismo se debe al descuido y a la falta de cuidado del Estado propiamente. (Enfasis suplido). Bayrón Toro v. Serra, supra, pág. 625, voto particular del Juez Asociado Señor Alonso Alonso.
Ciertamente, el mal que hoy se le impone a los trabajadores es producto del descuido administrativo que, por décadas, el Estado ha venido arrastrando y postergando. Sin embargo, urna mayoría de este Foro ha castigado al más inocente —al empleado— y ha premiado la irresponsabilidad del más culpable: el Gobierno. Con ello, ha consentido a que el Estado apunte su lanza en contra de los servidores públicos, para así poder sembrar terror, acusarlos y repartirles las responsabilidades que declinó ejercer. Ante tal proceder, no me queda otra opción que disentir.
V
Por los fundamentos expuestos, resulta irremediable reconocer que la Ley Núm. 3-2013 adolece de patentes vicios constitucionales. En consecuencia, procedía revocar al Tribunal de Primera Instancia.

 Esta prohibición constituye una de las limitaciones expresas de la Constitución federal al poder de Estados de la Unión. U.S. Trust Co. of New York v. New Jersey, 431 US 1, 14 (1977). Esta limitación no vincula al Gobierno federal. E. Chemerinsky, Constitutional Law: Principles and Policies, 4th ed., Maryland, Ed. Wolters Kluwer, Sec. 8.3.1, 2011, pág. 645. No obstante, el Gobierno federal queda sujeto a prohibiciones análogas en su naturaleza por virtud de la Quinta Enmienda de la Constitución federal, que garantiza el derecho a un debido proceso de ley. Id.

 El Tribunal Supremo federal ha abordado este requerimiento en las siguientes palabras:
“[...] The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of the contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.
“The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of [...] contracts. Contracts enable individuals to order their personal [...] affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them”. (Enfasis nuestro). Allied Structural Steel Co. v. Spannaus, 438 US 234, 245 (1978).
En Dominguez Castro et al. v. E.L.A. I, supra, pág. 83, una mayoría de este Tribunal, según estaba compuesto en aquel entonces, añadió que un menoscabo contractual severo es aquel que modifica “adversamente los términos o condiciones esenciales del contrato que principalmente dieron motivo a la celebración de éste de modo que se frustren las expectativas de las partes”.

 El Tribunal Supremo federal ha afirmado lo anterior en los siguientes términos:
“[...] [i]t is competent for the States to change the form of the remedy, or to modify it otherwise, as they may see fit, provided no substantial right secured by the contract is thereby impaired. No attempt has been made to fix definitely the line between alterations of the remedy, which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights. Every case must be determined upon its own circumstances”. (Enfasis suplido y citas omitidas). Home Bldg. & Loan Ass’n v. Blaisdell, supra, pág. 430.

 Se ha reconocido que el intento por remediar un problema social o económico de naturaleza amplia y general puede constituir un interés público importante y significativo. Energy Reserves Group, Inc. v. Kansas Power and Light Co., supra, pág. 412.

 El profesor de derecho constitucional, Erwin Chemerinsky, al interpretar la exigencia del Tribunal Supremo federal respecto a que la medida empleada sea necesaria y que no existan alternativas cuyos efectos sean menos drásticos a la hora de alcanzar el interés público articulado por el Estado, concluyó que el Más Alto Foro federal equiparó el escrutinio utilizado en casos de menoscabo de relaciones contractuales públicas a un escrutinio estricto. Chemerinsky, op. cit., See. 8.3, pág. 655. Ello implica, necesariamente, que la inconstitucionalidad de la legislación impugnada debería presumirse.

 Sistema de Retiro de los Empleados del Gobierno, Origen, déficit actuarial y recomendaciones, Comisión Especial Permanente sobre los Sistemas de Retiro, enero 2013, Vol. 3.

 Desde 1957 la Oficina del Contralor, por medio de los distintos informes de auditoría, señaló el déficit actuarial y las recomendaciones que han de seguir. Mediante el Informe Núm. DB-58-04 de 30 de septiembre de 1957 se estableció un déficit actuarial de $23,705,363; el Informe Núm. DA-83-41 de 30 de junio de 1983 estableció un déficit actuarial de $1.1 billones al 30 de junio de 1975; el Informe Núm. DA-89-43 lo estableció en $2.8 billones al 30 de junio de 1984; el Informe Núm. DA-96-28 de 14 de mayo de 1996 lo estableció en $4.5 billones al 30 de junio de 1994, y el Informe Núm. RF-12-03 de 13 de enero de 2012 lo estableció en $17 billones al 30 de junio de 2009.

 Véase el Informe de la Oficina del Contralor DA-89-43.

 Véanse: Ponencia del Departamento de Hacienda sobre el P. de la C. 888 de 12 de marzo de 2013, pág. 3; Informe Positivo de 12 de junio de 2013 de la Comisión de Hacienda y Finanzas Públicas del Senado de Puerto Rico con relación al P. de la C. 1055, Ira Sesión Ordinaria, 17ma Asamblea Legislativa. En la actualidad, el Sistema de Retiro desembolsa cerca de $1.55 billones anualmente y recibe $750 millones, por lo que el 52% de sus obligaciones no están cubiertas. De estos se espera que para el 2014 el Estado desembolse el 1.4% del Fondo General. Véase Puerto Rico adopts major pension reform and proposes sales tax expansion for fiscal 2014 budget, May 15, 2013, Moody’s Investors Service, en: http://www.gdb-pur.com/documents/ PensionReformIssuerComment-5-15-13.pdf.

 Véanse, además: Employee’s Retirement System of the Government of the Commonwealth of Puerto Rico, Estados financieros para el año término de 30 de junio de 2011 realizados por Deloitte & Touch, LLP y la Valorización Actuarial al 30 de junio de 2011, Milliam, Wayne, PA. Para este periodo los beneficios se entienden que procederán de dinero prestado.

 Refiérase a las Valorizaciones Actuariales al 30 de junio de 2011 y al 30 de junio de 2007, Milliman, Wayne, PA.

 Véanse: Ley Núm. 95 de 29 de junio de 1963 (3 LPRA secs. 729a-729m) (aportación a planes de salud); Ley Núm. 98 de 4 de junio de 1980 (3 LPRA see. 761 n.) (aguinaldo de Navidad); Ley Núm. 14 de 24 de abril de 1987 (3 LPRA see. 761 n. y 18 LPRA see. 383) (aguinaldo de Navidad); Ley Núm. 109-1997 (3 LPRA see. 761 n. y 18 LPRA see. 383) (aumentó el aguinaldo de Navidad); Ley Núm. 37-2001 (3 LPRA sec. 757g) (bono de verano); Ley Núm. 155-2003 (3 LPRA sec. 757j) (bono de medicinas); Ley Núm. 159-2003 (3 LPRA see. 761 n.) (aumentó el aguinaldo de Navidad); Ley Núm. 433-2004 (3 LPRA see. 761 n.) (aumentó el aguinaldo de Navidad); Ley Núm. 144-2005 (3 LPRA see. 761 n. y 18 LPRA see. 383) (aumentó el aguinaldo de Navidad).

 Véanse: Ley Núm. 169 de 30 de junio de 1968 (25 LPRA see. 391 et seq.); Ley Núm. 105 de 28 de junio de 1969 (3 LPRA sec. 188a); Ley Núm. 4 de 7 de abril de 1985 (3 LPRA sec. 188a); Ley Núm. 13-1992 (3 LPRA sec. 188a); Ley Núm. 156-2003 (3 LPRA sees. 766 y 766d) (aumentó en un 50% la pensión al cónyuge).

 Véanse: Ley Núm. 11 de 13 de abril de 1986(3 LPRA see. 773); Ley Núm. 316-2000 (3 LPRA see. 773) (aumentó en $250 pago mínimo por defunción); Ley Núm. 524-2004 (3 LPRA see. 773) (aumentó en $250 pago mínimo por defunción).

 Véanse: Informe de Auditoría RF-13-10 de 8 de mayo de 2013 de Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura para el período del 1 de julio de 2003 al 30 de junio de 2012; Employee’s Retirement System of the Government of the Commonwealth of Puerto Rico, Estados financieros para el año término del 30 de junio de 2011 realizados por Deloitte & Touch, LLP; Ley Núm. 72 de 20 de junio de 1956 (3 LPRA see. 750).

 El Informe de Patronos Morosos al 13 de mayo de 2013, refleja que las corporaciones públicas y los municipios adeudan al sistema $58,618,412.18 y $26,772,919.33, respectivamente, en concepto de leyes especiales, tales como: bonos de navidad, bonos de medicamentos, pagos de préstamos, remesas y programas de retiro temprano, entre otros. Además, se estima que la Autoridad de Acueductos y Alcantarillados adeuda al Sistema de Retiro $833,219,000 y el Fondo del Seguro del Estado $984,943,000 por falta de cumplimiento con el Art. 2-116 de la Ley Núm. 447 (3 LPRA see. 781).

 A modo de ejemplo: Ley Núm. 110 de 7 de junio de 1973 (1973 Leyes de Puerto Rico 480) (promovió un préstamo de $100 millones al presupuesto general sin el pago de intereses); Ley Núm. 97-2002 (3 LPRA sec. 830q); Ley Núm. 168-2005 (3 LPRA sec. 830q) (concedió un plan de pago a aquellos empleados que retiraron sus aportaciones del Sistema de Retiro).

 Véanse: Ley Núm. 127 de 27 de junio de 1958 (25 LPRA see. 376 et seq.) (concedió beneficios a participantes de alto riesgo); Ley Núm. 2 de.26 de marzo de 1965 (3 LPRA secs. 21-24) (anualidad vitalicia a exgobernadores antes de 1992 y $10,000 a la viuda); Ley Núm. 80 de 13 de julio de 1988 (29 LPRA see. 814) (acreditó los servicios militares prestados con anterioridad y posterioridad a la Ley Núm. 447); Ley Núm. 71 de 17 de agosto de 1989 (3 LPRA see. 765) (acreditó el tiempo que un dirigente obrero sirvió a una unión); Ley Núm. 116-1993 (3 LPRA sec. 765) (acreditó los servicios prestados por los empleados de la Oficina Legal de Santurce, Inc.); Ley Núm. 24-1994 (27 LPRA see. 401 n.) (retiro temprano a los empleados de la Autoridad de Teléfonos de Puerto Rico y sus subsidiarias); Ley Núm. 90-1994 (7 LPRA sees. 1226-1226b) (retiro temprano a los empleados de la Corporación de Crédito y Desarrollo Comercial y Agrícola de Puerto Rico); Ley Núm. 149-1994 (3 LPRA see. 765) (acreditó los servicios prestados a la Asociación de Pensionados del Gobierno de Puerto Rico, Inc.); Ley Núm. 54-1995 (3 LPRA see. 761 n.) (Retiro Temprano a los empleados del Banco Gubernamental de Fomento); Ley Núm. 255-1995 (3 LPRA sees. 764-765) (eliminó el impedimento por edad para entrar al Sistema de Retiro y la acreditación por años de servicio); Ley Núm. 3-1996 (3 LPRA sees. 764 y 782) (incluyó compulsoriamente a los empleados y funcionarios municipales); Ley Núm. 49-1996 (3 LPRA see. 765) (incluyó como servicios acreditables los prestados por los empleados de la Asociación de Alcaldes de Puerto Rico, la Federación de Municipios de Puerto Rico y los Consorcios Municipales); Ley Núm. 57-1996 (3 LPRA see. 766) (incluyó a los alcaldes como funcionarios que pueden acogerse al Sistema de Retiro); Ley Núm. 204-1997 (23 LPRA secs. 306-306c) (retiro temprano a Compañía de Fomento Industrial); Ley Núm. 182-1998 (retiro temprano a empleados de las Ramas Ejecutiva, Legislativa y Judicial); Ley Núm. 217-1998 (3 LPRA see. 765) (acreditó el tiempo trabajado a los empleados de la Administración del Derecho al Trabajo); Ley Núm. 370-1999 (3 LPRA sees. 7001 y 7004) (retiro temprano a empleados del Municipio de San Juan); Ley Núm. 112-2000 (3 LPRA sees. 7011-7014) (retiro temprano a empleados del Banco Gubernamental de Fomento); Ley Núm. 119-2000 (3 LPRA sees. 7031-7041) (retiro temprano a empleados de la Corporación del Fondo del Seguro del Estado); Ley Núm. 174-2000 (3 LPRA sees. 5018-5034) (retiro temprano a empleados de las Ramas Ejecutiva, Legislativa y Judicial); Ley Núm. 193-2000 (3 LPRA see. 765) (acreditó el servicio prestado por empleados de San Juan Legal Services Incorporated); Ley Núm. 218-2000 (3 LPRA see. 765) (acreditó el servicio prestado por empleados de Agencias del Gobierno de los Estados Unidos de Norte América); Ley Núm. 339-2000 (3 LPRA sees. 5001-5002) (retiro temprano a los empleados del Departamento de Salud); Ley Núm. 464-2000 (3 LPRA sees. 7015-7017) (retiro temprano a los empleados del Banco Gubernamental de Fomento para Puerto Rico, la Autoridad para el Financiamiento de las Facilidades Industriales, Turísticas, Educativas, Médicas y Control Ambiental y de la Corporación para el Financiamiento de la Vivienda de Puerto Rico); Ley Núm. 360-2004 (7 LPRA sees. 1231-1236) (retiro temprano a los empleados de la Compañía de Comercio y Exportación de Puerto Rico); Ley Núm. 143-2005 (23 LPRA sees. 307-307Í) (retiro tem *919 prano empleados de la Compañía de Fomento Industrial); Ley Núm. 273-2006 (23 LPRA see. 673 et seq.) (retiro temprano a los Empleados de la Compañía de Turismo); Ley Núm. 33-2007 (3 LPRA see. 765) (eliminó el requisito mínimo por tiempo servido al legislador municipal); Ley Núm. 66-2007 (7 LPRA sees. 1237 et seq.) (retiro temprano a los empleados de la Compañía de Comercio y Exportación de Puerto Rico); Ley Núm. 188-2007 (7 LPRA secs. 608-608h) (retiro temprano a los empleados del Banco Gubernamental de Fomento); Ley Núm. 59-2008 (28 LPRA see. 301 et seq.) (retiro temprano a los empleados de la Autoridad de Tierras de Puerto Rico); Ley Núm. 136-2008 (3 LPRA see. 331 et seq.) (retiro temprano a los empleados del Departamento del Trabajo y Recursos Humanos); Ley Núm. 244-2008 (3 LPRA see. 7051 et seq.) (retiro temprano a los empleados de la Junta de Calidad Ambiental); Ley Núm. 275-2008 (3 LPRA see. 7071 et seq.) (Retiro Temprano a los empleados de la Administración del Derecho al Trabajo); Ley Núm. 70-2010 (3 LPRA see. 8881 et seq.). Según cifras presentadas por la Oficina del Contralor en su Ponencia de 14 de marzo de 2013 sobre el P. del C. 888, pág. 3, el costo de los empleados que se acogieron al retiro temprano ronda en los $739,894,544.

 Véanse: Ley Núm. 124 de 8 de junio de 1973 (3 LPRA see. 761 n.); Ley Núm. 23 de 23 de septiembre de 1983 (3 LPRA sec. 138ZZ) (la mitad del aumento de ciertas pensiones); Ley Núm. 221-1998 (3 LPRA see. 761 n.) (aumentó en un 3% las anualidades pagadas por la Ley Núm. 447); Ley Núm. 22-2005 (3 LPRA sec. 766g) (fijó la edad de retiro obligatorio de los miembros de la Policía de Puerto Rico y el Cuerpo de Bomberos a los 58 años de edad); Ley Núm. 35-2007 (3 LPRA sees. 766 y 766d) (concedió otro aumento de 3% a las anualidades pagadas para ciertas pensiones y aumentó la pensión mínima por $100 mensuales); Ley Núm. 15 de 24 de abril de 1987 (3 LPRA sees. 766 n.); Ley Núm. 207-1995 (3 LPRA sec. 779a); Ley Núm. 134-1996 (3 LPRA sec. 766e y 25 LPRA sec. 378a) (aumento COLA a pensionados de alto riesgo); Ley Núm. 221-1998 (3 LPRA see. 761 n.); Ley Núm. 208-2000 (3 LPRA see. 766f) (aumento de $200 a pensión de ciertos beneficiarios); Ley Núm. 40-2001 (3 LPRA see. 761 n.) (aumento adicional de 3%); Ley Núm. 156-2003, supra; Ley Núm. 157-2003 (3 LPRA see. 761 n.).

 Conforme al Informe Final de 28 de septiembre de 2012 de la Comisión de los Sistemas de Retiro del Servicio Público de la Cámara de Representantes con relación a la R. de la C. 477, 7ma Sesión Ordinaria, 16ta Asamblea Legislativa, existen 4,027 pensionados y beneficiarios mayores a los noventa años de edad. Estos reciben una pensión mensual con leyes especiales de alrededor de $1,895,000.

 Véanse: Ley Núm. 216-2008; y Ley Núm. 234-2008.

 Sobre este particular refiérase a las ponencias presentadas durante la discusión del P. de la C. 888 que se convirtió en la Ley Núm. 3-2013: (1) Memorial *920 Explicativo de 20 de marzo de 2003 sobre el P. de la C. 888, presentado por los Servidores Públicos Unidos de Puerto Rico Concilio 95/AFSCME, págs. 4-5; (2) Ponencia de 8 de marzo de 2013 del Ledo. Héctor Mayol Kauffmann, Administrador de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura sobre el P. de la C. 888, pág. 3; (3) Ponencia de 12 de marzo de 2013 del Banco Gubernamental de Fomento sobre el P. de la C. 888, págs. 2-3; (4) Ponencia de 12 de marzo de 2013 del Departamento de Hacienda sobre el P. de la C. 888, pág. 4; (5) Ponencia de la Federación de Pensionados y Jubilados de Puerto Rico sobre el P. de la C. 888, págs. 2-4 y 6-7; (6) Ponencia de 12 de marzo de 2013 de la Federación del Trabajo de PR-AFL-CIO, la Central Puertorriqueña de Trabajadores, la Central Alianza Laboral y la Asociación de Maestros de Puerto Rico sobre el P. de la C. 888, págs.7-13; (7) Ponencia de 11 de marzo de 2013 de la Oficina de Gerencia y Presupuesto sobre el P. de la C. 888, pág. 2; (8) Ponencia de 14 de marzo de 2013 del Grupo de Funcionarios y Empleados de la Oficina del Contralor de Puerto Rico sobre el P. de la C. 888, págs. 2-3.

 Ley Núm. 42 de 19 de junio de 1987 (3 LPRA see. 779); Ley Núm. 46 de 29 de junio de 1988 (3 LPRA secs. 779-779c).

 Al momento de su aprobación, varios sectores reclamaron y denunciaron la falta de información actuarial para valorizar las propuestas aprobadas. Entre estos sectores, se encontraron los siguientes: los Servidores Públicos Unidos de Puerto Rico Concilio 95/AFSCME, la AARP, la Federación del Trabajo de PR-AFL-CIO, la Central Puertorriqueña de Trabajadores, la Central Alianza Laboral y la Asociación de Maestros de Puerto Rico, la Local 2396, representante exclusiva de los empleados de Comedores Escolares, la Local 1850, representante exclusiva de los empleados de la Asociación de Empleados del Gobierno de Puerto Rico, y el Sr. José Melara, representante internacional y “Organizing Coordinator” de la UAW.

 Debido al gran número de propuestas, se propuso que se hiciera un solo proyecto para recogerlas, denominado Ley de Recáudos para Salvar las Pensiones de los Participantes y Empleados Públicos del Gobierno Central. Véase Ponencia de la Asociación de Empleados de Comedores Escolares de Puerto Rico UAW Local 2396 ante la Comisión de Asuntos Laborales y Sistemas de Retiro del Servicio Público de la Cámara de Representantes de Puerto Rico sobre el P. de la C. 888.

 Se refiere al dinero depositado pero no acreditado a la cuenta de su destinatario. Ese dinero devenga intereses para las entidades bancarias mientras se finaliza ese proceso.

 El salario promedio es calculado a base de los salarios más altos durante cualesquiera 36 meses.

 El salario promedio es calculado a base de los últimos cinco años de servicio.

 La Ley Núm. 3-2013 contempla que la rentabilidad de las aportaciones nunca será menor del 80% del rendimiento neto de la cartera de inversión por semestre de rentabilidad. La anualidad se hará a base de un factor a determinarse por el actuario del Sistema de Retiro y la expectativa de vida actuarial con la tasa fija garantizada.

 Específicamente, la Ley Núm. 447 proveía para que un empleado público con menos de 58 años de edad y con diez a veinticinco años de servicios pudiera recibir una pensión diferida una vez alcanzara los 58 años de edad. Asimismo, este beneficio de pensión diferida también estaba disponible para aquellos servidores públicos que se hubiesen retirado con veinticinco años de servicio, pero con menos de 55 años de edad.

 Ello surge de que hoy los funcionarios bajo la Ley Núm. 447, que al 30 de junio de 2013 no cumplan con las condiciones descritas, podrán retirarse escalonadamente de la manera siguiente: si el empleado tiene 57 años de edad, el retiro será cuando el empleado alcance los 59 años de edad; si el empleado tiene 56 años de edad, podrá retirarse a los 60 años de edad; si el empleado tiene 55 años de edad o menos, será elegible para el retiro cuando alcance 61 años de edad. Véase Sec. 17 de la Ley Núm. 3-2013.

 Ello se desprende de que la edad de retiro para los participantes de la Reforma 2000 era, en su mayoría, de 60 años de edad. Ahora, con la nueva ley, si al 30 de junio de 2013 el empleado tiene 59 años de edad, el retiro será opcional a los 61 años de edad; si tiene 58 años de edad, podrá retirarse a los 62 años de edad; si tiene 57 años de edad, será elegible para el retiro a los 63 años de edad; si tiene 56 años de edad, podrá jubilarse a los 64 años de edad y si tiene 55 años o menos, será elegible a los 65 años de edad. Véase Sec. 17 de la Ley Núm. 3-2013.

 Véase Secs. 19 y 26 de la Ley Núm. 3-2013.

 Recordemos que las peticiones de certificación ante nuestra consideración impugnan una desestimación conferida por el Tribunal de Primera Instancia. Ante ello, tomamos como ciertos todos los hechos bien alegados en las demandas de los peticionarios. Epifanio Vidal, Inc. v. Suro, 103 DPR 793 (1975). Una desestimación solo procederá si, luego de resolver toda duda a favor de los peticionarios demandantes, encontramos que estos no exponen una reclamación que justifique la concesión de un remedio. Ramos Lozada v. Orientalist Rattan Furniture, 130 DPR 712 (1992). A su vez, tomamos conocimiento judicial de todas las ponencias y los proyectos de ley presentados ante la Asamblea Legislativa con relación al sistema de retiro de los empleados públicos.

 En iguales términos, recordemos que toda legislación que procure menoscabar relaciones contractuales debe ser temporera en su naturaleza. Aquí, los cambios impugnados no tienen un ámbito de aplicabilidad limitado. Al contrario, estos son de carácter permanente. Ello abona a su inconstitucionalidad.

 Véase Ponencia de 14 de marzo de 2008 del Grupo de Funcionarios y Empleados de la Oficina del Contralor de Puerto Rico sobre el P. de la C. 888, págs. 7-8.

 A.S. Negrón García, Tribunal Supremo y sistema de retiro, El Nuevo Día, 18 de junio de 2013.

 íd.